IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| JOHN SHIELDS and | : | |
|---|---|---|
| CONSTANCE SHIELDS, | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| v. | : | NO. 08-2169 |
| | : | |
| UNITED STATES OF AMERICA | : | |
| Defendant | : | |

**MEMORANDUM**

**STENGEL, J.**                                                                                                  December 21, 2009

John and Constance Shields filed this tort action against the United States on May 9, 2008. They claim that John Shields suffered extensive injuries as a result of negligence on the part of the United States, the operator of the U.S.S. Blue Ridge.

This court has jurisdiction over Mr. Shields' case pursuant to 28 U.S.C. § 1331, because it arises under federal law.

**I. BACKGROUND**

The U.S.S. Blue Ridge is a military vessel owned and operated by the United States which was stationed in the Port of Yokosuka, Japan. Pl.'s SUF ¶ 1. Sometime on or around May 18, 2006, a fan room aboard the Blue Ridge became flooded with human waste and sewage from a nearby restroom facility. Pl.'s SUF ¶ 4. That waste leaked into

1

the Fleet Intelligence Center ("FIC"), the room below the fan room, and directly onto computer equipment located in the FIC known as the PTW Stereo Client Equipment Rack ("PTW"), which will alternately be referred to as the "computer equipment" or "computer tower." Id. at ¶¶ 4, 5. The PTW was used, along with other equipment in the FIC, to operate the Blue Ridge's weapons system. Id. at ¶ 5.

Following the leak, Navy personnel cleaned the outside of the computer tower located in the FIC with an iodine-based solution and the inside with isopropyl alcohol. Def.'s SUF ¶ 16. After cleanup was complete, Naval personnel attempted to "re-energize" the computer in the FIC, but it failed to operate. Id. at ¶ 22.

Lockheed Martin Corporation is under contract with the United States government to perform work on the Blue Ridge. Charles McKinstry is employed by Lockheed as a Multi-Function System Analyst Manager; he learned about the waste leak and damage to the PTW approximately a week after it occurred. Def.'s SUF ¶¶ 8–10. He was informed by Navy personnel that the equipment had been satisfactorily cleaned but was not working properly. Pl.'s SUF ¶ 12. Mr. McKinstry dispatched John Shields, another Lockheed employee, to perform repair work on the computer equipment because Mr. Shields had originally installed it. Id. at ¶ 12. Mr. Shields' assignment was to replace any damaged computer equipment. Id.

Mr. Shields arrived at the Blue Ridge on June 8, 2006 and met with Lieutenant Commander Richard King before beginning work on the damaged equipment. Pl.'s SUF

2

¶ 24. Lieutenant King, who was involved in coordinating cleanup and repair of the equipment, testified during a deposition that he considered the equipment in question safe for Mr. Shields to work on, but could not remember exactly what he told Mr. Shields at the time of their meeting. Id. Both Mr. McKinstry and Lieutenant King informed Mr. Shields that the equipment was clean and safe for work. Id. On June 12, 2006, while performing the repair work, Mr. Shields was scratched on his right arm by a plastic zip tie holding cables together inside the computer. Id. at ¶ 13. A few days later, while in Hawaii on a different job for Lockheed, he bumped that arm and it began to swell. Id. at ¶ 29. Mr. Shields' arm quickly worsened, and he was diagnosed with compartment syndrome and severe cellulitis. Id. Mr. Shields has provided the report of a pathologist indicating that his cellulitis was caused by his exposure to human waste contaminants present on the plastic zip tie that caused the laceration to his arm. Id. at ¶ 51.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is

"material" when it could affect the outcome of the case under the governing law. Id.

A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing "based on the affidavits or by depositions and admissions on file" that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322; Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir.1992).

The court must view the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252.

4

**III. DISCUSSION**

Both parties agree that Mr. Shields' claim is covered by the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. Section 901, *et seq.*[1] As enunciated by the Supreme Court, there are three distinct duties ship owners owe to ship repair workers that, if breached, may result in a finding of negligence under Section 905(b) of the LHWCA. A private person may bring an action against a negligent shipowner for injuries sustained while performing work on the vessel. 33 U.S.C. § 905(b); Scindia, 451 U.S. at 168–181. The first duty is the turnover duty, which relates to "the condition of the ship upon the commencement of stevedoring operations." Howlett v. Birkdale Shipping Co., 512 U.S. 92, 98, 114 S.Ct. 2057 (1994). The second is the active control/active operations duty, which provides that the "shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel." Id. The third is the duty to intervene, which "concerns the vessel's obligations with regard to cargo operations in areas under the principle control of the independent stevedore." Id. While these duties are, in large part, phrased in terms of a stevedore's work on a vessel,[2] the LHWCA applies to "any person engaged in maritime employment"

---

[1] For a background on the history and purpose of the LHWCA, see Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614 (1981).

[2] A stevedore is "one who works at or is responsible for loading and unloading ships in port." Merriam-Webster's Collegiate Dictionary, 1224 (Eleventh Edition). A longshoreman is "a person who loads and unloads ships at a seaport." Id. 734.

including "a ship repairman." 33 U.S.C. § 902(3).

The United States argues that the turnover duty is the duty applicable to Mr. Shields' claim and that it has not been violated. The turnover duty "compris[es] both a duty to provide safe conditions and a corollary duty to warn of known, nonobvious hazards." Kirsch v. Plovidba, 971 F.2d 1026, 1028 (3d Cir. 1992) (citing Scindia, 451 U.S. at 167). The United States claims that, because Lockheed supervisors were made aware that human waste had been spilled on the computer equipment and that "the ship's cleaning of the [computer] Tower did not resolve the operational problem," it discharged its duty to warn Mr. Shields, a Lockheed employee, of any latent hazard.

Mr. Shields claims that the active control duty and not the turnover duty applies to his claim. The Third Circuit has held that, "[i]n the longshoring context . . . to trigger the active operations duty, the vessel must have substantially controlled or been in charge of (i) the area in which the hazard existed, (ii) the instrumentality which caused the injury, or (iii) the specific activities the stevedore undertook." Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 540–41 (3d Cir. 1994) ("A jury may find that the vessel exercised control or took charge over an area either because it never turned exclusive control of the area over to the stevedore but retained substantial control, or because the vessel substantially interfered, by invitation or otherwise, with the stevedore's exercise of exclusive control.") Mr. Shields argues that, because the U.S. retained substantial control over the area in question—the FIC containing the computer tower—the active control duty applies.

The District Court need not determine which duty of care applies when there is a genuine issue of material fact precluding summary judgment on that issue. See Serbin v. Bora Corp., Ltd., 96 F.3d 66, 71 (3d Cir. 1996) (affirming the District Court's determination that issues of fact precluded summary judgment on issue of whether turnover or active operations duty applied to plaintiff's claim). Whether the turnover duty or the active operations duty applies to Mr. Shields' claim is, to some extent, irrelevant, because "determining that [he] could prevail on any theory will be enough to overcome the summary judgment against him." Id. In Serbin, the Third Circuit reversed the District Court's grant of summary judgment in favor of a shipowner. See id. at 68–70. The plaintiff, who suffered injury as the result of a stuck block atop a cargo unit, and the defendant shipowner disagreed over the applicable duty owed. Id. The court found that, "with the exception of the obviousness inquiry . . . which duty controls is not important here: *if* the block presented a hazard—whether through the turnover duty or the active operations theory—the ship breached its duty to Serbin." Id. (emphasis in original).

Mr. Shields has offered sufficient evidence to create a genuine issue of material fact concerning which duty applies. Mr. Shields has presented deposition testimony from Mr. McKinstry, his supervisor at Lockheed, indicating that Lockheed technicians are subject to restrictions while aboard Navy ships. McKinstry Dep. 115: 12–24. They must report to Navy officers stationed on the ship who are "in charge" of the areas in which the technicians work, and must give daily reports on the status of their work. Id. at 116: 1–9. Mr. Shields testified that before he began work on the equipment in the FIC, he spoke

with a Navy security officer. Shields Dep. 136: 17–19. Lieutenant King testified that when technicians came aboard the Blue Ridge, he would "meet with [them] to come aboard and review the scope of work to be done, to facilitate anything that they need so it's very clear." King Dep. 100: 5–8. A finder of fact could reasonably infer from this evidence that, by requiring technicians to frequently report on the status of their work and check in with Navy personnel, the operators of the U.S.S. Blue Ridge retained substantial control over the computer equipment on which Mr. Shields performed repair work and that, as a result, the active operations duty applies to his case.

Because Mr. Shields has presented sufficient facts to allow a reasonable jury to infer that the active operations duty was triggered here, the next inquiry is whether he has established a prima facie case of breach of that duty. See Serbin, 96 F.3d at 71 (citing Davis, 16 F.3d at 541). To establish a prima facie case, a plaintiff must show:

> "(1) that the vessel appreciated, should have appreciated, or with the exercise of reasonable care would have appreciated, the condition; (2) that the vessel knew, or should have known, that the condition posed an unreasonable risk of harm to a longshore worker; (3) that a longshore worker foreseeably might fail to (i) either discover the condition or apprehend the gravity and probability of the harm, or (ii) protect himself or herself from the danger; and (4) that the vessel failed to take reasonable precautionary or remedial steps to prevent or eliminate the dangerous condition."

Id. (citing Davis, 16 F.3d at 541).

Mr. Shields has met the first element. There is no doubt that the defendant operators of the Blue Ridge appreciated that human waste had leaked from a restroom facility onto the computer equipment located in the FIC on which Mr. Shields would

8

eventually be working.  See Def.'s Ex. B.

Mr. Shields has also met the second requirement to prove a prima facie case.  The Manual of Naval Preventive Medicine states that "[m]edical department representatives must be alert to any increase in disease incidence among . . . members of the surrounding community which may be attributed to exposure to human wastes."  Pl.'s Ex. 15, 7-15, 7-16.  It also requires that personnel exposed to human waste "wear protective clothing including coveralls, rubber boots, rubber gloves, face shields, hair covering and an oxygen breathing apparatus as appropriate when contact with sewage is likely during maintenance or spill clean-up operations."  Pl.'s Ex. 15, 7-20.  To meet this prong of the prima facie case, a plaintiff need not present specific evidence beyond the dangerous condition to show that it is hazardous.  Serbin, 96 F.3d at 72.  Because a plaintiff need only show a general hazard, this Court may draw any reasonable inference that the condition posed an unreasonable risk of harm.  Id.  A reasonable finder of fact could infer that, because the Naval manual warns of disease associated with exposure to human waste and requires that workers exposed to it wear protective equipment, the operators of the Blue Ridge knew or should have known that the presence of human waste on the computer equipment posed an unreasonable risk of harm to Mr. Shields, including the possibility that human waste would come into contact with his skin and cause an infection.

Mr. Shields has presented evidence sufficient for the third element of the prima facie case, "that a longshore worker foreseeably might fail to (i) either discover the

condition or *apprehend the gravity and probability of the harm*, or (ii) protect himself or herself from the danger." Serbin, 96 F.3d at 71 (emphasis added). This prong is essentially an inquiry into whether the dangerous condition was obvious to the plaintiff. Id. at 73 (citing Davis, 16 F.3d at 543–44). The U.S. makes much of the fact that Mr. Shields was aware that human waste had spilled onto the computer equipment. Even assuming that Mr. Shields was aware that human waste had spilled onto the computer equipment before he arrived to repair it, one can reasonably infer that the danger posed by the equipment at the time he was in the process of repairing it was not obvious, since he has been informed by Naval personnel that the equipment was clean, decontaminated, and safe to work on, Shields Dep. 172: 1–12; 181: 13–24; 181: 1–3, and because any evidence of the spill remaining on the equipment looked like salt residue, not human waste. Shields Dep. 182: 4–10. Even if the equipment's contamination was obvious to Mr. Shields, "obviousness is not a complete bar to liability." Serbin, 96 F.3d at 74 (citing Davis, 16 F.3d at 543–45).

Mr. Shields has presented evidence sufficient for the fourth element of the prima facie case. Even if Navy personnel were "simply unaware of any continuing danger to Mr. Shields from the computer tower," Def.'s Reply at 8, this would not support summary judgment in favor of the U.S. The prima facie case articulated in Davis applies to dangerous conditions a vessel owner "should have appreciated, or with the exercise of reasonable care would have appreciated." Naval personnel were aware that human waste had leaked onto the computer equipment, undertook to clean the equipment, and informed

Mr. Shields that the equipment was safe to work on. Mr. Shields has presented evidence that the use of alcohol to clean the equipment was not in accordance with Navy procedures which require that areas contaminated with sewage be cleaned with water and a stock detergent. Pl.'s Ex. 15, 17-20(4). Even if Naval personnel thought the equipment was safe to work on, a jury could find that the choice to use alcohol instead of water and stock detergent to clean the equipment was an unreasonable failure to protect against danger from the presence of waste on the equipment, and that any belief the equipment was safe was unreasonable.

## IV. CONCLUSION

There are genuine issues of material fact in this case concerning the applicable duty of care and whether the U.S. was negligent in failing to take reasonable steps to prevent Mr. Shields from injury resulting from his exposure to human waste. Therefore, the United States' motion for summary judgment is denied. An appropriate order follows.